**In re ANCHOR POST FENCE CO.**
**No. 8020.**

District Court, D. Maryland.
May 9, 1936.

Semmes, Bowen & Semmes, of Baltimore, Md. (Frederick W. Brune and W. Randall Compton, both of Baltimore, Md., and Gilbert Ferris, of New York City, of counsel), for debtor company.

Lester Y. Baylis, of Huntington, N. Y., for Bank of Huntington & Trust Co., and others.

WILLIAM C. COLEMAN, District Judge.

The Anchor Post Fence Company, a New Jersey corporation, whose principal business is the manufacture and erection of wire fences, iron railings, gates, and other related products, and also the manufacture and sale of oil burners, filed a petition in this court on November 13, 1934, seeking the protection afforded by the provisions of section 77B of the Bankruptcy Act (11 U.S.C.A. § 207), its principal place of business and its principal offices being, and having been for years past, in Baltimore. It has two wholly owned subsidiaries, namely, American Fence Construction Company, a New York corporation, and Anchor Post Fence Company of California, a California corporation.

Because of the satisfactory operating methods and condition in which its administrative overhead expenses were found, and the expectation that a plan of reorganization could be rather promptly formulated and approved, this court deemed it unnecessary to appoint a trustee. Accordingly, the debtor company was allowed to continue in possession of its property and to operate under its own management, subject, however, to strict periodical supervision of its operations.

The question now before the court is whether it should confirm the plan of reorganization as finally submitted, with numerous amendments, which has received the approval of more than the requisite two-thirds of the creditors and of more than the requisite majority of the preferred stockholders (the interests of the common stockholders not being materially and adversely affected). Also, the special master appointed by the court to advise it respecting the plan has recommended that the plan as now finally submitted be confirmed.

A brief outline of the capitalization of the company is essential to an understanding of the plan, and to a determination of whether it is fair and equitable. As of the date when the jurisdiction of this court commenced, the company's capitalization was as follows: First mortgage 6½ per cent. serial bonds, $327,000 outstanding; 8 per cent. cumulative preferred stock, par value $100, 1,066 shares issued, of an authorized issue of 1,500 shares, on which no dividends had been paid since May 1, 1932; $7 cumulative preferred stock with no par value, 233 shares issued, of an authorized issue of 5,000 shares on round figures, $443,000. In addition, the appraised value of machinery and equipment, etc., is $146,000, making, in round figures, a total value of all real estate, machinery, and equipment that has been appraised, $589,000. The company owns in addition certain other machinery and equipment of very speculative value, estimated at approximately $17,000. Thus the value of all the company's fixed assets is approximately $606,000. An abbreviation of the company's balance sheet as of December 31, 1935, in round figures, omitting numerous small items that have been carried as probable assets, is as follows:

| Assets | | Liabilities | |
|---|---|---|---|
| Fixed Assets | $ 606,000 | Secured Claims (Mortgage Bonds, principal and interest) | $ 349,000 |
| Current Assets | 333,000 | Unsecured Claims (Trade creditors) | 111,000 |
| Other Assets | 138,000 | Current Liabilities | 16,000 |
| | | Capital Stock | |
| | | 8% Preferred Stock (par value $100 a Share) | 96,000 |
| | | $7.00 Preferred Stock (no par value,—$100 a Share) | 23,000 |
| | | Common Stock (no par value,—at $2.00 plus a Share) | 482,000 |
| Total | $1,077,000 | | $1,077,000 |

which likewise no dividends had been paid since May 1, 1932; and, finally, common stock of no par value, 227,731 shares issued, of a total authorized issue of 300,000 shares.

The company's chief competitors are the Cyclone Fence Company, a subsidiary of the American Steel & Wire Company which, in turn, is a subsidiary of the United States Steel Corporation; and the Page Fence Company, the latter controlled by the American Chain Company. The company's main plant and the only one now in operation is located in Baltimore. It was erected in 1927 and is equipped to handle about three times the company's present business. The value placed upon it by the appraisement obtained by this court through an entirely disinterested source, for land and all improvements, is $290,000. In addition to this plant, the company owns other plants, not in use, at Euclid, Ohio, and Garwood, N. J., as well as certain other real estate and buildings in Newark, N. J., and Mineola, Long Island. There has been no market for any of this latter property. The total appraised value of all of the real estate and improvements is, in

The year 1928 was the first full year of the company's operations at the Baltimore plant. Its interest charges were not earned in that year, but were in 1929 and 1930, with a slight margin after depreciation. The business of the company so greatly declined that whereas there was a net profit of $175,000 in 1929, there was a loss of $84,000 in 1933, and the losses for the two prior intervening years were materially greater. Accordingly, by November, 1934, its book surplus had been nearly extinguished and liquidated current assets were not sufficient to enable the company to pay interest on its bonded indebtedness, not to speak of meeting its serial bond maturities, with the result that the jurisdiction of this court was sought and obtained under section 77B of the Bankruptcy Act.

As early as February 8, 1935, the debtor company filed a plan of reorganization. Hearings were had thereon and various amendments were proposed, with the result that on July 17, 1935, a plan was submitted which has now received the approval of 72 per cent. of all outstanding bondholders, 88 per cent. of the general

creditors, 60 per cent. of the $7 preferred stock, and 64 per cent. of the 8 per cent. preferred stock. It is further significant that there were no dissenting stockholders, and of the 28 per cent. of the bondholders who did not approve of the plan, only 12 per cent. actually dissented. Since the amount of common stock is not altered by the plan, and since the rights of common stockholders are not materially or adversely affected, the consent of such stockholders to the plan was not sought.

The primary features of the plan thus approved are the following: (1) Priority claims and unsecured claims not in excess of $100 each, to be paid in full in cash; unsecured claims in excess of $100 each to receive nonnegotiable and noninterest-bearing notes, due May 15, 1945. (2) The lien securing the first mortgage 6½ per cent. bonds to continue, but the serial features are abandoned and all maturities extended to May 15, 1945; with interest rate reduced from 6½ per cent. to 5 per cent., accruing from May 15, 1934, payable only out of available net earnings. However, after the bonded indebtedness has been reduced to $200,000, and after the interest on the outstanding bonds has been paid to date and the claims of unsecured trade creditors which are extended under the plan have been paid in full, the interest upon the bonded indebtedness becomes a fixed obligation. (3) Dividend rate on present 8 per cent. cumulative preferred stock is reduced to 6 per cent., retroactive as to all past, unpaid accumulated dividends; provided, however, that no dividends shall be paid until outstanding bonded indebtedness shall have been reduced to $200,000 principal amount and the notes given to trade creditors paid in full. (4) The dividend rate on the present $7 cumulative preferred stock is reduced to $5, retroactive as to all past and unpaid accumulated dividends, but with the same restriction as to payment of any dividends as are imposed upon the 8 per cent. preferred stock. (5) The common stock to remain undisturbed, except that no cash dividends shall be paid on it until outstanding bonded indebtedness shall have been reduced to $100,000 principal amount, and until the notes given to trade creditors shall have been paid in full. (6) Net earnings to be allocated and applied as follows: (a) Fifteen per cent. thereof for additional working capital; (b) balance to extent required in payment of interest and accumulated interest on the bonds at the 5 per cent. rate; (c) the remainder to be applied pro rata to the reduction of the notes issued for unsecured claims; (d) after the notes have been paid in full, net earnings to be applied in the following manner: (1) Fifteen per cent. to working capital as above; (2) balance to extent required to interest as above; and (3) 50 per cent. of the remainder to a sinking fund for the purchase or redemption of bonds. (7) A committee consisting of six bondholders (or their nominees) appointed initially by the court, with power in the committee to fill vacancies, such committee to have veto power over sale of any of the company's mortgaged property as to which a release from the mortgage lien may be obtained; and to function until the bonded indebtedness of the company has been reduced to $100,000.

After numerous hearings at which all parties whose interests were affected by the plan were given full opportunity to be heard, and after careful examination of the plan as finally modified, it is believed that it is fair and equitable and does not discriminate unfairly in favor of any class of creditors or stockholders, and is feasible, and therefore should be confirmed. Summarizing its primary features, the debtor company is accorded relief from payment of fixed interest and the embarrassment of providing for maturities of the principal of its bond indebtedness, for a number of years. The allocation of available earnings is believed to be fair and equitable to all interests concerned. While the primary concessions or sacrifices are made by the holders of securities senior to those having the junior equity, that is, the common stockholders which, at first blush, might appear to be inequitable, it was urged upon the court, and accepted as a very potent argument, that the expense and difficulty involved in securing the consent of the common stockholders would be entirely disproportionate to such more equitable results as might be obtained by including such stockholders in the plan and altering their status. There is no question but that the company is greatly overcapitalized. Sales of its stock were exploited. At just what prices the no-par value stocks were originally issued is not fully disclosed. However, the 223,-421 shares of the common stock of the company are held by approximately 2,400 holders, and to obtain consents from the

majority of them, it was estimated would entail an outlay of not less than $12,000, probably much more. As will be seen from the balance sheet figures of the company hereinbefore given, there would appear to be a real equity for both the preferred and common stockholders, although, of course, the size of such equity is speculative. Normally under such circumstances a court would be inclined to insist upon a very substantial reduction in the company's capitalization, to the end that (1) no stockholder could in the future reasonably maintain that he had been lulled into a belief that he, whether assenting to or dissenting from the plan, was left thereby in possession of some interest in the company of much greater value; and that (2) those who are inherently entitled to have at least a prominent part in its management, to wit, the bondholders, might be given such representation. But the present situation is unusual and warrants unusual treatment. The provisions of section 77B of the Bankruptcy Act do not contemplate, nor is it possible in a reorganization of this kind, that the best or ideal plan is always capable of adoption. The question of future management is, of course, of primary importance, and in order that there may be obtained substantially that degree of control by the bondholders and also by the trade creditors to which they are undoubtedly entitled in order to insure adequate protection of their interests in the company's assets, the court has made it a condition of its approval of the plan that the common stockholders, in whom is vested entire voting rights, shall first have so changed the personnel of their directorate (consisting of ten members), as to insure such representation. This has been done; the changes in personnel have been submitted to and approved by the court, as well as the initial plan with respect to the company's officials. Also, the creation of the bondholders' committee, heretofore referred to, affords a desirable check on possible dissipation of the company's fixed assets.

The company's difficulties in the past have been primarily due to excessive capital outlay in plants and subsidiaries, and to depletion of its cash assets as a result of very substantial losses during the recent depression years, with consequent inability to meet its interest charges and its serial bond maturities. The plan of reorganization is based upon the hope of accumulating sufficient funds over the next few years to pay off the company's trade creditors and then to resume payment of interest on its bonds. The necessity was indicated and indeed has arrived for the company to borrow $15,000, perhaps more in the near future, on a short-term basis. Such authorization has recently been given to the company by appropriate order of this court. The business of the company shows a very encouraging condition with respect to its net operating income, that is to say, whereas it had a net operating deficit, in round figures, after depreciation, of $67,000 in 1931; of $212,000 in 1932; of $23,000 in 1933 and of $55,000 in 1934, for the year 1935, there is shown a net operating profit of $22,000. Through rigid economies in operation and management the company may be able to build up its earnings and carry on successfully, although the fact must be realized that the future of any such business is fraught with much speculation largely because its products are largely semiluxuries in character, and are sold in a highly competitive field.

While the plan as now finally submitted embraces six important amendments to the plan as proposed to the various parties in interest prior to the last hearing before this court, none of these amendments, it is believed, required resubmission or rehearing because they are not believed materially adverse to the interest of any party to the original plan. Subdivision (f) of section 77B of the Bankruptcy Act (11 U. S.C.A. § 207 (f) provides for approval of changes of this sort, as does the plan itself, by the court, without resubmission to parties in interest.

The first of the amendments referred to limits the conclusiveness of a determination of available net earnings so as to operate only in favor of the Trustees. The second amendment requires that the company purchase bonds upon tenders, rather than acquire them through private purchases. The third amendment provides for setting up a bondholders' committee with veto powers over sales of mortgaged property, this committee to function until the bonded indebtedness has been reduced to $100,000. The fourth amendment provides that after the bonded indebtedness has been reduced to $200,000, and after the interest on the outstanding bonds has been paid to date and the claims of unsecured trade creditors which are extended under the plan have been paid in full, the interest

upon the bonded indebtedness shall become a fixed obligation. The fifth amendment provides that no cash dividend shall be paid upon the common stock of the company until the bonded indebtedness shall have been reduced to $100,000 instead of $200,000 as provided in the original plan. The sixth and last amendment merely changes the form of the new bonds to be issued so as to conform to the provisions of amendment four.

It will be seen that all of these amendments are primarily in favor of the bondholders. None of them is materially adverse to the bondholders nor to trade creditors. It is true that the interest on the bonds becomes fixed at a stated time instead of being payable exclusively out of available net earnings, which may be said to affect adversely the preferred stockholders who have consented to the plan. However, under the plan as originally submitted, such interest was cumulative out of available net earnings, and it is thus only a question of degree as to whether or not the effect upon preferred stockholders is material, and I am of the opinion that it is not.

For the aforegoing reasons, the plan embodying all of the six amendments will be confirmed, and the final order which will be signed will provide that these amendments shall be embodied in the proposed supplemental mortgage indenture under which the new bonds will be issued, in substantially the same form in which they will be set forth in such order.